# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 5, 2014

## STATE OF TENNESSEE v. COURTNEY KNOWLES

**Appeal from the Criminal Court for Shelby County**
**No. 07-06139     James M. Lammey, Jr., Judge**

_____

**No. W2013-00503-CCA-MR3-CD  - Filed May 5, 2014**

_____

The defendant, Courtney Knowles, appeals his Shelby County Criminal Court jury conviction of rape of a child, challenging the sufficiency of the convicting evidence.  Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Courtney Knowles.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E.D. Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Samuel Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In August 2007, the Shelby County grand jury charged the defendant with two counts of rape of a child, the victims of which were the minor daughters of the defendant's girlfriend.  Prior to trial, the State agreed to sever the two counts and, in January 2012, the trial court conducted a jury trial on the first count of rape of a child.

T.M.,[1] the victim's mother, testified that, in 2004, the defendant moved into her residence to live with her and her three children.  The victim is T.M.'s oldest child and daughter; T.M. also had a second daughter and a son.  T.M. explained that, although the defendant moved into her house and was her boyfriend, he was also her half-brother, the two

_____

[1]To protect the anonymity of the minor victim, we will refer to her mother by her initials.

sharing the same biological father. T.M. and the defendant had two children together, the first born in March 2006 and the second in March 2007.

T.M. testified that, in January 2005, the defendant told her that he had "licked" the victim. The defendant then immediately recanted the statement, stating that "he just was saying that for me to make him leave my house." T.M. allowed the defendant to stay in her residence.

In the spring of 2005, T.M.'s younger daughter suffered a stroke and was hospitalized for approximately one month. During that period of time, the defendant and T.M.'s aunt were responsible for taking care of the victim and T.M.'s son.

On Easter Sunday 2007, T.M., while running errands, found the defendant's video camera inside her vehicle's glove compartment. She noticed a video tape ("the tape") inside the camera. The tape showed the victim seated on the living room sofa in T.M.'s house, and although she could not see the defendant's face on the video, she recognized the defendant's voice, and she saw the defendant "touch[ing the victim's] vagina." T.M. immediately drove home and confronted the defendant about the tape. A girl by the name of Lynn was also visible on the tape, and although the defendant willingly showed T.M. the portion of the tape that included Lynn, he did not show T.M. the portion that included the victim. T.M. removed the tape from the video camera, and, the following day, she took the tape to a camera store and paid to have the contents of the tape transferred to a digital video disc ("DVD").

T.M. later informed the defendant that she had made a DVD of the tape. Over the course of the next few weeks, T.M. and the defendant fought over the whereabouts of the DVD and the tape, which T.M. had hidden inside a handbag. During their final fight, the defendant put a gun to T.M.'s head and threatened to kill her. The defendant eventually left the residence, and T.M. then contacted the police. When law enforcement officers arrived at her house, T.M. gave the DVD to them. She attempted to play the DVD for them, but it was damaged. The next day, T.M. returned to the camera store, and the store was able to provide her with another copy of the DVD because the video was still saved in the store's system. T.M. then provided the new copy of the DVD to the police. T.M. testified that the defendant received the video camera from T.M.'s brother in February 2007.

On cross-examination, T.M. admitted that, when the defendant reported "licking" the victim in 2005, she did not contact the police. T.M. also admitted that she waited 17 days after viewing the video tape of the defendant's molesting the victim before contacting the police. When asked why she did not contact the police, T.M. responded that she "was scared" and that "people in the family didn't know about the relationship" between

the defendant and her.

On redirect examination, T.M. agreed that she had waited to contact law enforcement officers about her daughter's abuse but that, once she did, she contacted both the Memphis Police Department ("MPD") and the Federal Bureau of Investigation ("FBI").

MPD Sergeant Judith Blue testified that she was patrolling the north precinct of Memphis on April 25, 2007, when she was dispatched to T.M.'s residence due to a 911 hang-up call. When Sergeant Blue arrived at the scene, she encountered T.M., who stated that she had been involved in a physical altercation with the defendant and that the defendant had threatened her with a handgun. T.M. also informed Sergeant Blue "that there was some sexual abuse going on that involved her minor daughter." T.M. gave Sergeant Blue the defendant's video camera and the DVD. Sergeant Blue testified that T.M. then attempted to play the DVD on the home computer, but, due to a large scratch on the DVD's surface, the video was not clear. Other officers transported the video camera and the DVD to the police precinct. Sergeant Blue stated that she provided a description of the defendant and his vehicle to Sergeant Dennis Manning, who located the defendant and took him into custody.

MPD Officer Ryan Jackson testified that he was called to T.M.'s residence on April 25 to process the video camera, several DVDs, and a book entitled "The Evil That Men Do: FBI Profiler - The Journey Into the Minds of Sexual Predators."

MPD Sergeant Dennis Manning testified that he arrived at T.M.'s residence on April 25 just after Sergeant Blue arrived. After speaking with Sergeant Blue and T.M., Sergeant Manning left the residence to attempt to locate the defendant. Approximately two blocks from T.M.'s house, Sergeant Manning located the defendant driving the pickup truck that T.M. had described. Sergeant Manning arrested the defendant for the aggravated assault of T.M. When processing the defendant's vehicle, Sergeant Manning found a nine-millimeter handgun.

The victim testified that she was 16 years old and in the tenth grade. The victim stated that, in 2005, she and her younger siblings shared a bedroom in T.M.'s house and that T.M. and the defendant shared a bedroom. The victim testified that she was unaware that her "Uncle Courtney" was her mother's boyfriend until T.M. "had a baby." With respect to her relationship with the defendant, the victim stated that he treated her like a niece until 2005 when she was in the third grade. In April 2005, the victim's younger sister suffered a stroke and was admitted to the hospital. The victim accompanied T.M. and the defendant to the hospital, and at T.M.'s suggestion, the defendant drove the victim home from the hospital to pack a change of clothes and other necessary items. The victim then testified as follows:

Q:     Okay.  What happened when you went home that day?

A:     Well, we was getting everything ready, and then [the defendant] called me in the room, and he took all my clothes off, and he was just touching on me; and he made me touch his private area – his penis area.  And he was trying to show me how to suck his penis area by describing with his finger.

Q:     You said he described it with his finger? – what did he do with his finger?

A:     He was licking his finger to show me what to do with his penis.

Q:     Did you try and do what he asked you to do?

A:     Yes, ma'am.

Q:     You said he was touching on you.  Where was he touching you?

A:     He had touched me on my breasts, my private area – well, my vagina and my butt.

Q:     What room was this in?

A:     My mother's room.

The victim testified that she was scared and that she cried for her mother.  Eventually, the defendant stopped, and he drove the victim back to the hospital.  The victim did not tell T.M. what had happened.

The victim testified that the defendant continued to sexually abuse her "like every day like when we were in the shower or tub or when my mother was gone or asleep." The victim stated that the defendant would touch her vagina, breasts, and buttocks and that he would "lick [her] vagina."  The defendant did not ask the victim to lick his penis again, but he once attempted to insert his penis "in [her] bottom."  The victim described that incident, stating that the defendant "had me like on my mama's bed – it was in the middle of her bed; and he was on the bed too; and his knees was on the bed, and he had my bottom

-4-

in the air." The victim asked the defendant to stop, and he complied.

The victim testified that, on more than one occasion, the defendant would molest her while she was in the shower and that many times she would awaken in the night to the defendant's touching her. The victim reported that the defendant used his cellular telephone to take photographs of her breasts, vagina, and buttocks while she was naked, and she testified that the defendant once used his video camera to film the sexual abuse. The victim described that incident as follows:

> Well, my mama, she left that day and said she went to the store; and [the defendant] just walked in with the camera. I was lying on the couch. And he said – he took my clothes off; and he had my legs up; and he had my shirt (indiscernible). He was playing with my breasts, my vagina, and my bottom; and he turned me over to play with my bottom and my vagina area too.

The State played a portion of the DVD for the victim, and from the video she identified herself, the defendant's voice, and the defendant's hands touching her body. The victim also identified handwritten notes that the defendant had given her which stated, among other things, "'Do you want me – do you want me to love you and [your younger sister]; or do you want me to love just you?'" and "'Can I lick you today?'"

The victim testified that, on one occasion between the first incident of abuse and the making of the DVD, she was in the defendant's vehicle when he drove her to a hotel:

> I'm thinking that he was gonna pick somebody up, but he took me to the hotel, took all my clothes off, and he was touching on me, licking my vagina; and he – had his penis out, but he weren't sticking it inside my vagina. He had it like on top moving back and forth. And he did it so long that that sperm came out, and he was like, "Look what you make me do."

On cross-examination, the victim admitted that, when she gave a statement to the MPD in May 2007, she did not mention that the defendant had shown her how to lick his penis or that he had licked her vagina, and she acknowledged that she did not mention the hotel room incident in her May 2007 statement.

On redirect examination, the victim explained that she had not mentioned those details in her MPD interview because she was not asked those specific questions and because she was scared. The victim acknowledged that she was in the fifth grade and had just turned

12 years old when she was interviewed in May 2007. The victim emphasized that everything she had testified to at trial was truthful, and the victim confirmed that she described the appearance of the defendant's penis to law enforcement officers during her interview.

Sally Discenza, a sexual assault nurse examiner with Rape Crisis in Memphis and a family nurse practitioner with St. Jude Children's Research Hospital, testified as an expert in forensic nursing. Ms. Discenza examined the 12-year-old victim on May 4, 2007. She first obtained a history from T.M. and the victim, and the victim reported that the defendant had touched "her breasts, buttocks and vagina, with his hands at least two time[s] a week over the last year; and on three occasions, he attempted to penetrate her anus with his penis." Ms. Discenza also testified that the victim "said that [the defendant] threatened to kill her if she told anybody."

After speaking with the victim, Ms. Discenza conducted a physical examination of the victim. Ms. Discenza found no recent injuries to the victim's vaginal and anal area, but she did find indications of past injuries to both areas. Explaining that the vaginal tissue of premenstrual girls is more susceptible to injury, Ms. Discenza described injuries to the victim that were more consistent with "some type of sexual penetration." Ms. Discenza testified that she had also examined the victim in 1998 when the victim was three years old following a report that T.M.'s then-boyfriend had "touched her down there." Ms. Discenza's 1998 physical examination of the three-year-old victim revealed no vaginal or anal lacerations or redness. Based on her 2007 examination of the victim, Ms. Discenza opined that the victim had sustained a penetrating injury to her vagina, and she further opined that the injury was not due to the 1998 reported sexual assault.

On cross-examination, Ms. Discenza admitted that she did not know exactly when the penetrating injury occurred, although she was able to opine that the injury had occurred within the past "year or so." With respect to the victim's anal fissure, Ms. Discenza conceded that such fissures can develop due to poor diet and constipation.

On redirect examination, Ms. Discenza agreed that the victim had not reported any problems with constipation, hard stool, or chronic diarrhea but that she had reported attempted anal penetration by the defendant.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

Based on this evidence, the jury convicted the defendant as charged of rape of a child. Following a sentencing hearing, the trial court imposed a sentence of 25 years, to

be served consecutively to the defendant's sentence in a federal case. On April 26, 2012, the trial court issued an order denying the defendant's motion for new trial, and the defendant did not file a notice of appeal.[2] On February 6, 2013, the trial court entered a judgment dismissing the defendant's second charge of rape of a child, and on February 21, the defendant filed a motion in this court seeking acceptance of his late-filed notice of appeal, explaining that he mistakenly believed that the notice of appeal did not need to be filed until after the second child rape count had been tried. On March 11, 2013, this court, in the interest of justice and pursuant to Tennessee Rule of Appellate Procedure 4(a), waived the timely filing requirement and granted the defendant 10 days in which to file a notice of appeal. The defendant complied, and in this appeal, the defendant contends only that the evidence adduced at trial was insufficient to support his conviction.

Although the defendant has framed his issue as one of evidentiary sufficiency, we perceive the real issue to be whether the State properly elected the offense for which it was seeking a conviction. We begin with an overview of the pertinent legal principles. The law is well-settled that the prosecution must elect the facts upon which it is relying to establish the charged offense, if evidence is introduced at trial indicating that the accused has committed more offenses against the victim than were charged. *See State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001); *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). Most often, the election requirement arises in the sex-crimes context when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See Johnson*, 53 S.W.3d at 631; *Brown*, 992 S.W.2d at 391-92. "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." *Johnson*, 53 S.W.3d at 631.

Our supreme court has expounded upon the election requirement as follows:

> If . . . the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. . . . Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit.

---

[2]The defendant did, however, file a pro se application for extraordinary review pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, which application was denied by this court on May 30, 2012.

Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation . . . to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence.

*State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993) (internal citations and footnote omitted).

In the instant case, the defendant was charged with a single count of rape of the child victim occurring between January 1, 2005 and April 21, 2007. "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

At the conclusion of the trial, the State announced its election in the following fashion:

We're going to elect the – although we are not going to have a date specific, we are going to elect the alleged act of rape of a child occurring in April, 2005, at [T.M.'s residence] when the victim and defendant returned from the hospital. I think that's the one that had the most detail.

The trial court then asked the State "to elect either fellatio or cunnilingus," to which the prosecutor initially replied, "I don't want to do that. I want you to make me," and "I just thought if I decided if I didn't want to, you wouldn't make me." The trial court insisted that an election of a specific type of penetration was necessary, stating, "I need to say rape of a child by cunnilingus . . . [o]r rape of child by fellatio. I don't . . . recall any digital penetration." The prosecutor decided she was "going to go for cunnilingus on that one because there was more testimony about that as a continuing act of rape of a child by cunnilingus." The trial court then recited the jury charge on election as follows:

In this case, the state has elected to submit, for your consideration, the alleged act of rape of a child by cunnilingus occurring in April, 2005, at [T.M.'s residence], when [the victim] and [the defendant] returned home from the hospital to obtain clothing, toiletries, and food.

The prosecutor thanked the trial court, apparently acknowledging that the proposed charge on election of offenses was accurate.

Without question, the specific incident referred to in the election was the April 2005 instance when the defendant drove the victim home to collect clothing and other items to return to the hospital following the victim's sister's stroke. The victim testified that, on that particular day, the defendant called her into T.M.'s bedroom, removed all of her clothing, "touched [her] on [her] breasts, . . . [her] vagina and [her] butt," and demonstrated how to perform fellatio on him, which the victim attempted. The description of the assault was certainly sufficient to identify the specific incident for the jury, and it was unquestionably sufficient to establish unlawful sexual penetration and thus rape of a child. The issue, however, is that the victim did not testify to penetration by cunnilingus, as elected by the State, but rather penetration by fellatio.

Despite this obvious mistake on the part of the prosecution, we perceive no unanimity problem *under these particular circumstances* because the instance of fellatio was the *only* instance of penetration that occurred on that specific day under those very specific circumstances. As such, the jury's decision to convict the defendant of rape of a child could *only* have been reached if the jury unanimously decided that unlawful sexual penetration had occurred, and because fellatio was the only type of penetration that the victim testified occurred on that particular occasion, the jury must have used that act as the basis for the conviction, despite the erroneous reference to cunnilingus in the jury charge. *Compare Shelton*, 851 S.W.2d at 138 (holding that the State's failure to elect was harmless beyond a reasonable doubt as to one of three victims because the jury's verdict of aggravated rape "on this count only" indicated that "the jurors must have considered the evidence of" a specific incident of penile penetration on the victim's birthday in convicting the defendant) *with State v. Clabo*, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995), *perm. app. denied* (Tenn. June 5, 1995) (holding that defendant was denied a unanimous jury verdict and ordering a new trial when the State presented proof of both oral and anal penetration and failed to elect which type of penetration it was relying on in seeking conviction of aggravated rape).

Bearing in mind that the "purpose of election is to ensure that each juror is considering the *same occurrence*," *Shelton*, 851 S.W.2d at 138 (emphasis added), and equally mindful that "a harmless error analysis is appropriate only where the proof overwhelmingly established the offense for which conviction is sought and proof of the other crimes is marginal or tangential," *State v. James Clayton Young, Jr.*, No. 01C01-9605-CC-00208, slip op. at 12 (Tenn. Crim. App., Nashville, May 22, 1998) (citation omitted), we conclude that the State's election error was harmless beyond a reasonable doubt. Based on the facts of this case, the victim's articulate and particularized testimony of a single act of penetration by fellatio under very specific circumstances is enough to satisfy the requirement of jury

-9-

unanimity despite the State's inaccurate election.

That said, we address the defendant's claim that the evidence was generally insufficient to sustain his conviction. We review this claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As we stated previously, rape of a child "is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" where the victim is over the age of 3 and under the age of 13, T.C.A. § 39-13-522(a), and sexual penetration includes fellatio, T.C.A. § 39-13-501(7). In the instant case, the Shelby County grand jury charged the defendant with "unlawfully and intentionally sexually pentrat[ing the victim], a person more than three (3) years of age but less than thirteen (13) years of age, in violation of T.C.A. [§] 39-13-522." The indictment did not mention the nature of the penetration. At trial, the victim testified that, when she was in the third grade, the defendant forced her to perform fellatio on him after first demonstrating "how to suck his penis area by describing with his finger." When asked if she had attempted to "do what he asked you to do," the victim responded in the affirmative. Regardless of the terms of the election, the evidence supported the commission of the offense as alleged in the indictment. Our analysis of the sufficiency of the evidence focuses upon whether the elements as alleged in the indictment were established, and, clearly, the State established those elements by showing the sexual penetration of the third-grade victim. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of rape of a child.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE